J-S18026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| SHEILA M. BRONSON | : | |
| Appellant | : | No. 521 MDA 2018 |

Appeal from the Judgment of Sentence January 30, 2018
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s): CP-35-CR-0000464-2016

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| SHEILA M. BRONSON | : | |
| Appellant | : | No. 1163 MDA 2018 |

Appeal from the Judgment of Sentence Entered January 30, 2018
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s): CP-35-CR-0000464-2016

BEFORE:   BOWES, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                **FILED: MAY 24, 2019**

Appellant Sheila M. Bronson appeals from the judgment of sentence imposed following her jury trial convictions for theft by unlawful taking and tampering with records.[1] Appellant alleges that the Commonwealth presented

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3921(a), 4104(a).

insufficient evidence to establish that she committed the offenses, and the trial court erred by precluding certain evidence. We affirm.

We adopt the trial court's facts and procedural history. *See* Trial Ct. Op., 8/1/18, at 3-13. On January 30, 2018, the trial court sentenced Appellant to thirty-six to seventy-two months' imprisonment, plus three years' probation, for theft by unlawful taking. The court imposed a consecutive term of seventeen to thirty-six months' imprisonment, plus two years' probation, for tampering with records.

On February 8, 2018, Appellant timely filed a petition for reconsideration of sentence. That same day, Appellant also filed post-trial motions seeking an acquittal or new trial. On February 27, 2018, the trial court entered an order denying Appellant's petition for reconsideration of sentence. The order noted that the court would conduct a hearing before deciding Appellant's remaining post-trial motions. Nevertheless, the order advised Appellant of his right to file a notice of appeal within thirty days.

The trial court conducted its hearing on Appellant's post-sentence motions on March 13, 2018. At the hearing, Appellant requested to submit a brief in lieu of oral argument. The court granted Appellant's request and established a briefing schedule. Before either party submitted a brief, however, Appellant filed a notice of appeal on March 29, 2018. This Court subsequently docketed the appeal at 521 MDA 2018.

On April 4, 2018, the trial court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. After receiving

an extension, Appellant timely filed her Rule 1925(b) statement.[2]  The court

issued its Rule 1925(a) opinion on August 1, 2018.[3]

Appellant now raises two questions for this Court's review:

1. Did the Commonwealth present sufficient evidence to establish, beyond a reasonable doubt, that Appellant was the perpetrator of either theft or tampering with records . . . ?

2. Did the trial court err as a matter of law or abuse its discretion in precluding the defense from presenting evidence that the alleged victims operated illegal gambling devices in their establishments from which they generated income and which was relevant to not only the income and accounting techniques of the victims, but also their credibility?

Appellant's Brief at 2.

After a review of the parties' briefs, the record, and the trial court's

decision, we adopt and affirm on the basis of the trial court's opinion

addressing the merits of the issues raised on appeal.  **See** Trial Ct. Op. at 14-

20, 23-25.  The Commonwealth presented sufficient evidence to establish that

Appellant stole in excess of $100,000, but less than $500,000, from the

---

[2] Although Appellant raised nineteen additional issues in her Rule 1925(b) statement, she has abandoned those issues on appeal by failing to raise them in her brief.  **See Commonwealth v. Rodgers**, 605 A.2d 1228, 1239 (Pa. Super. 1992) (stating that "[w]e must deem an issue abandoned where it has been identified on appeal but not properly developed in the appellant's brief" (citation omitted)).

[3] Despite the fact that Appellant already filed a notice of appeal, the Lackawanna County Clerk of Judicial Records entered an order on June 14, 2018, denying Appellant's post-trial motions by operation of law.  Again, this order informed Appellant of his right to file a notice of appeal within thirty days.  Consequently, Appellant filed a second notice of appeal on July 12, 2018, which this Court docketed at 1163 MDA 2018.  On August 28, 2018, this Court consolidated Appellant's appeals *sua sponte*.

victims' convenience stores, and she hid the theft by manipulating the spreadsheets used to track cash and credit purchases. *See id.* at 14-20. Further, the court did not err in precluding evidence that the victims operated illegal gambling devices in their convenience stores prior to 2012 because (1) the victims removed the devices before Appellant's theft; (2) Appellant could not demonstrate relevance by articulating the amount of income the devices generated; and (3) Appellant could not cross-examine one of the victims about an expunged criminal record related to the devices where the underlying offense was not *crimen falsi*. *See id.* at 23-25. Accordingly, having discerned no abuse of discretion or error of law, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2019

COMMONWEALTH OF
PENNSYLVANIA

v.

SHEILA BRONSON

:
:
:
:
:
:
:
:

IN THE COURT OF COMMON
PLEAS OF LACKAWANNA
COUNTY

16 CR 464

## OPINION

**BARRASSE, P.J.**

This opinion is filed pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate

Procedure and pursuant to the request of the Superior Court. Defendant Shelia Bronson (herein

after "Defendant") appeals this Court's January 30, 2018 Judgement of Sentence. The

Defendant's issues on appeal are as follows, *verbatim*:

1. Did the Commonwealth present sufficient evidence to sustain each element of the crimes charged where the object of the crimes, both theft and tampering with records, were not linked to the Defendant beyond a reasonable doubt?

2. Did the Commonwealth present sufficient evidence to sustain each element of the crimes charged when it relied solely upon the testimony of the victims and failed to present evidence from a forensic accountant or otherwise linking the alleged loss of funds and crimes to the Defendant beyond a reasonable doubt?

3. Did the Commonwealth present sufficient evidence to establish, beyond a reasonable doubt, that the Defendant was the perpetrator of either theft or tampering with records?

4. Was the verdict against the weight of the evidence for each element of the crimes charged where the object of the crimes, both theft and tampering with records, were not linked to the Defendant beyond a reasonable doubt?

5. Was the verdict against the weight of the evidence for each element of the crimes charged, theft and tampering with records, when it relied solely upon the testimony of the victims and failed to present evidence from a forensic accountant or otherwise linking the alleged loss of funds and crimes to the Defendant beyond a reasonable doubt?

6. Was the verdict against the weight of the evidence to establish, beyond a reasonable doubt, that the Defendant was the perpetrator of either theft or tampering with records?

7. Did the trial court err as a matter of law or abuse its discretion in allowing the Commonwealth to amend the Criminal Information which increased both the grading and penalty of the offenses charged?

1

8. Did the trial court err as a matter of law or abuse its discretion in precluding the defense from presenting evidence that the alleged victims operated illegal gambling devices in their establishments from which they generated income and which was relevant to not only the income and accounting techniques of the victims; but, also, their credibility?

9. Did the trial court err as a matter of law or abuse its discretion in allowing hearsay statements made by Diana Goodfield through Lorraine Goodfield over the objection of counsel which deprived the Defendant of confrontation and a fair trial? (NT, 11/1/17, p. 101-102).

10. Did the trial court err as a matter of law or abuse its discretion in allowing, over the objection of counsel, the admission of prior convictions of theft by deception and bad acts as prior bad acts which were barred by Pa. R. E. 404(a)(1) and (b)(1) and neither fit within an exception under Pa. R.E. 404(a)(2) and (b)(2) nor were they relevant as defined by Pa. R. E. 401?

11. Did the trial court err as a matter of law or abuse its discretion in allowing, over the objection of counsel, the admissions of prior convictions of theft by deception and bad checks where their probative value did not outweigh the unfair prejudice the admissions caused in violation of Pa. R.E. 403 and 404(b)(2)?

12. Did the trial court err as a matter of law or abuse its discretion in allowing, over the objection of counsel, the admission of prior civil claims and judgments which were barred by Pa. R. E. 404(a)(1) and (b)(1) and neither fit within an exception under Pa. R. E. 404(a)(2) and (b)(2) nor were they relevant as defined by Pa. R. E. 401?

13. Did the trial court err as a matter of law or abuse its discretion in allowing, over the objection of counsel, the admission of prior civil claims and judgments where their probative value did not outweigh the unfair prejudice the admissions caused in violation of Pa. R. E. 403 and 404(b)(2)?

14. Did the trial court err as a matter of law or abuse its discretion in allowing the admission of till reports, over the objection of counsel, where said evidence had lacked proper authentication and foundation? (NT, 11/2/17, p. 71-72).

15. Did the trial court err as a matter of law or abuse its discretion in allowing schedules prepared by Diana Goodfield which lacked proper authentication and foundation and were based upon till reports which, also, lacked proper authentication and foundation? (NT, 11.2.17, p. 73-74).

16. Did the trial court err as a matter of law or abuse its discretion in allowing the admission of 1400 pages of bank documents at trial where the documents were provided, for the first time, in the midst of trial by the Commonwealth thereby depriving defense counsel or a forensic accountant of adequately reviewing the documents, proffering a defense and, depriving the Defendant of a fair trial?

2

17. Did the trial court err as a matter of law or abuse its discretion in allowing the admission of 1400 pages of bank documents at trial where the documents were not properly authenticated? (N.T., 11/6/17, p. 7-8).

18. Did the trial court err as a matter of law or abuse its discretion by allowing the admission of hearsay testimony of the conclusions of the Commonwealth's accountant concerning bank records and any discrepancies therein through Detective Lisa Bauer? (N.T., 11/6/17, p. 20).

19. Did the trial court err as a matter of law or abuse its discretion by precluding the defense from engaging in cross-examination of a key witness for the Commonwealth, Detective Lisa Bauer, concerning modification of dates within the original and subsequent amended affidavit of probable cause or case summary which improperly and prejudicially foreclosed the Defendant from proffering an alibi defense? (N.T., 11/6/17, p. 16-18).

20. Did the trial court err as a matter of law and abuse its discretion by imposing a manifestly excessive sentence within the aggravated range of the Pennsylvania Sentencing Guidelines, by failing to consider the relevant sentencing criteria of the Pennsylvania Sentencing Code, including the personal characteristics of the Defendant, her rehabilitative needs, the need for protection of the public and the presence of mitigating circumstances?

21. Did the trial court err and abuse its discretion by imposing a manifestly excessive sentence within the aggravated range of the Pennsylvania Sentencing Guidelines, by utilizing facts already considered within the calculation of each respective Offense Gravity Score and failing to state sufficient reasons on the record for the sentence imposed?

For the following reasons, including a review of the record and the facts and history of the case, this Court's January 30, 2018 Judgment of Sentence should be affirmed.

## FACTUAL AND PROCEDURAL HISTORY

Under Docket Number CP-35-CR-0000464-2016, the Defendant was charged with one (1) count of Theft by Unlawful Taking in violation of 18 Pa. C.S.A. § 3921(a) (F1), one (1) count of Theft by Unlawful Taking in violation of 18 Pa. C.S.A. § 3921(a) (F2), two (2) counts of Tampering with Records in violation of 18 Pa. C.S.A. § 4104(a), and one (1) count of Receiving Stolen Property in violation of 18 Pa. C.S.A. § 3925(a).

On November 1, 2017, following an initial mistrial, trial before a jury commenced wherein the Commonwealth presented several witnesses. The victim, Lorraine Goodfield

3

(hereinafter "Lorraine), owner of the Cousin's Convenient Marts testified that she and her late husband, Larry Goodfield, worked in the convenient store industry for years before they purchased the Eynon store in 2002, after Larry retired from accounting. **Id. at 28-30.** In 2007, she opened a second Cousin's Convenient Mart location in Jessup, Pennsylvania (hereinafter, "Jessup store"). **Id. at 31-32.** Lorraine testified that she actively worked in the stores, but Larry handled the finances and accounting. **Id. at 34-35.** Lorraine explained that the business was "self-sufficient" and provided the Goodfields with a small salary while still leaving enough money in the business account to cover expenses and emergency repairs. **Id. at 35.** Lorraine testified that in early 2011, Larry was diagnosed with liver cancer and they decided to hire a bookkeeper to assist with the stores' accounting while Larry was receiving cancer treatment. **Id. at 38-39.** Lorraine related that the Defendant's daughter, Jessica Bronson, worked as a cashier at the Jessup location and the Defendant had long told her that she was a "numbers person" and would love to help with the businesses' accounting work. **Id. at 39-40.** Around April of 2011 Larry hired the Defendant; she first worked as a cashier before she took over the bookkeeping. **Id. at 42-43.** Lorraine described the Defendant's duties as collecting the money drops out of the safes, counting the cash, and entering the amounts of cash and credit card sales into an excel spreadsheet, which Larry checked daily. **Id.** Lorraine stated that the Defendant assisted Larry with the bookkeeping until his death in May 2012. **Id. at 46.**

After Larry's death, Lorraine's duties increased to include making the schedule, ensuring the registers were funded, and dealing with all of the venders, all while still working shifts as a cashier. **Id. at 48-49.** Lorraine attested that after Larry fell ill, the Defendant became the only other person with a key to the safes, and therefore the only person with access to the money in the safes. **Id. at 54.** Lorraine explained that at the end of each shift, a cashier would place all of the

4

cash, credit and debit card sales, as well as redeemed lottery tickets, into a bag and deposit it in the store safe. **Id. at 57-58.** Lorraine stated that the Defendant was responsible for collecting the bags from each store before returning to her desk at the store in Eynon to count the money and enter the data into an Excel spreadsheet. **Id. at 58-61.** She explained the Defendant's course of action to the jury. **Id.** Lorraine provided that upon entering all the data into the spreadsheet, the Defendant would notify Lorraine that the deposit was ready or if an error in calculating occurred. **Id. at 63.** Lorraine testified that she was solely responsible for depositing cash into the business' bank account. **Id. at 63-64.** The Defendant did not have access to the stores' bank account or payroll. **Id. at 66.** Lorraine conceded that once the Defendant finished data entry to generate the spreadsheet, Lorraine would review the bottom line of the spreadsheet for any shortages; however she did not thoroughly examine the accuracy of the data entered. **Id. at 68.**

Lorraine explained that initially it was difficult to gauge profit because of seasonal impact. **Id at 71.** However in 2013, Lorraine noticed that the business profits declined, but attributed it to repairing a gas tank and an air conditioning unit. **Id. at 74.** Lorraine noted that she simultaneously observed enhancements to the Defendant's lifestyle; for example, the Defendant frequently requested time off for expensive family vacations to Disney or to a beach. **Id. at 76.** Lorraine became confused as to how the Defendant was able to afford those expensive trips on her modest salary as the Defendant was solely employed by the store and it did not make sense that the store was struggling financially, but the Defendant financially thrived. **Id. at 76-78.** Lorraine concealed the stores' financial struggles from the customers and, importantly, the Defendant. **Id. at 78.** Lorraine stated that in 2014, her daughter, Vanessa Goodfield, graduated from college and joined the family business to assist Lorraine and Diana Goodfield Boccella, Lorraine's other daughter and the business manager of Cousin's Convenient Marts, and fill in for the Defendant while she

5

vacationed. **Id. at 79-82.** The Defendant trained Vanessa on how to collect the money from each safe and enter the data into the Excel spreadsheet. **Id. at 80.** In September 2014, Lorraine consulted with an accountant to discuss the business decline and potential factors included numerical errors and inventory management. **Id. at 82.**

In 2015, the business could not pay all of the food and drink vendors, so Lorraine withdrew $25,000 from her personal savings to sustain the business. **Id. at 92.** Lorraine also testified that in 2015 she spent her free time examining surveillance camera footage searching for thefts or any plausible explanation for the business decline. **Id. at 93.** Again, Lorraine consulted with her accountant, and she learned the business had lost hundreds of thousands of dollars in the past year alone. **Id. at 94.** She began to blame herself for the failing business. **Id.** In an attempt to increase sales, Lorraine borrowed money from her son to obtain a liquor license, and pay for store renovations. **Id. at 94-95.** When sales did not increase, and Lorraine confirmed no cigarette or gas thefts, she decided to "follow the money," with her daughter Diana. **Id. at 98.** Specifically, during one shift, Diana performed a separate data entry before the Defendant. Diana compared her separate Excel spreadsheet to the Defendant's Excel spreadsheet, and discovered a discrepancy in the amount of actual cash sales earned versus the amount entered for the credit/debit sales. **Id. at 98- 102.** Lorraine testified that Diana uncovered the Defendant's method of theft where the Defendant lowered the actual amount of cash collected and compensated the "bottom line," by entering an inflated credit/debit amount. The Defendant then pocketed a portion of the actual cash collected. **Id.** Lorraine believed that the Defendant drove the actual cash sales from the Jessup store to the Eynon store, and while she was driving, the Defendant would remove the actual cash sales out of the Jessup bag and then manipulate the

6

"bottom line" number so that the amount of credit/debit sales concealed the actual cash loss. **Id. at 103.**

The Defendant manipulated the Excel spreadsheet data for both stores before she combined the left-over cash into a single deposit slip. **Id. at 115-118.** Lorraine explained that if the Defendant had stolen $200.00 dollars from the Jessup location, she would lower the actual cash totals of both stores by $100.00 each, even though the actual cash only came from the Jessup store. However, Lorraine related that the Defendant's theft method and data manipulation could be independently verified by Gulf Oil Company which compiled its own credit/debit sales log. **See N.T. Trial, November 2, 2017, at p. 14-15.**

Subsequently, Lorraine contacted the Lackawanna County District Attorney Office's to conduct an investigation. **See N.T. Trial, November 1, 2017, at p. at 105.** During the investigation, Detective Lisa Bauer verified the correct credit/debit sales via the data compiled by Gulf Oil Company. **Id. at 104-105.** Through the Lackawanna County District Attorney's Office, Lorraine learned that since 2013, the Defendant stole approximately $525,000.00 in actual cash sales. **Id. at 106-107.**

Next, Lorraine's daughter, Diana Goodfield Boccella, (hereinafter "Diana") testified that after her father's death, she became the business manager in June 2012. **See N.T. Trial, November 2, 2017, at p. 21-22.** She stated that her responsibilities included oversight of accounts payable and accounts receivable, payroll, quarterly payroll-related taxes, cashier management, as well as invoicing and inventory pricing. **Id. at 23-25; 136.** In 2014, Diana described how the business declined significantly. **Id. at 33-34.** During this time, Diana noticed that the profits were not supported by the actual sales, because the actual sales were substantial. **Id. at 38.**

7

Diana testified that a year later the business struggled to pay the bills despite profit yields in excess of $100,000.00. **Id. at 41-47.** Diana recalled that Lorraine contributed her personal savings to the business. **Id. at 42-43.** In response, Diana investigated the data, and researched common theft schemes in the convenient store industry. **Id. at 45-47.** After "extensive, exhaustive searches" and a process of elimination Diana examined the actual cash sales. **Id. at 48-49.** She confirmed that the Defendant solely administered the actual cash sales, and consequently, Diana scrutinized the Defendant's daily duties. **Id. at 50.** On December 3, 2015, Diana performed her own data entry of the cash, credit/debit, and lottery sales conducted during one shift at the Eynon store. **Id. at 51-52.** The next day, the Defendant processed the actual cash bag in the same way she normally completed her daily data entry. **Id. at 53.** Accordingly, Diana compared her own data entry with the Defendant's data entry. She discovered that both end results matched, but the Defendant's data entry showed $90.00 dollars less in actual cash with an additional $100.00 dollars in credit/debit card sales. **Id. at 54-55.** Diana reviewed the cash register tapes, and confirmed that the Defendant stole a portion of the actual cash sales, and inflated the credit/debit card sales in order to balance the end result. **Id. at 56.** Based upon this discovery, Diana compared past data entries to till reports and uncovered a pattern of reduced cash sales with inflated credit/debit card sales. **Id. at 57.** She detected that the inflated credit/debit card sales amount corresponded with the reduced cash sales amount. To that end, she uncovered over $1,000.00 in cash sales stolen in December 2015. **Id. at 58.**

In support of her testimony, Diana explained the personal Excel spreadsheet she created to detect the Defendant's theft method. **Id. at 60.** Diana explained each column and entry on her Excel spreadsheet, delineating cash, checks, coupons, accounts, credit cards, vendor pay out, lottery pay out, employee credit, losses, and pizza pay outs. **Id. at 60-66.** Also on the Excel

8

spreadsheet, Diana showed a report section consisting of total tenders, lottery payouts, and safe drops. **Id. at 67.** She also utilized a till report during each shift to independently verify the actual cash sales. **Id. at 69.** Diana compared the cash number from the till to the cash plus the owes, less the safe drops, on her Excel spreadsheet. **Id. at 74-75.** Diana showed the jury the discrepancies in the Defendant's data entry using the December 3, 2015 report. Diana demonstrated that her actual cash sales calculations differed from the Defendant's by $90.00 dollars while the Defendant's credit/debit card sales calculation were inflated by $90.00 dollars **Id. at 79-83.** Diana labeled the Defendant's theft pattern of reducing the actual cash sales and increasing the credit/debit card sales as "scheme one," because she discovered a second theft method where the Defendant would alter the total amount of tenders in the report section to reflect less sales than actual sales. Diana labeled the Defendant's alternate theft pattern as "scheme two," which is only traceable through the till. **Id. at 83, 88-91.** She testified that although tills must be retained for seven years, several past tills were destroyed or otherwise missing. **Id. at 93.**

Finally, Diana explained that all actual cash sales and credit/debit card sales can be independently verified through the Gulf Oil Company. **Id. at 93.** She explained that the "Gulf Reports" are generated daily through the Gulf Oil Company network. The Gulf Report generates the inside sales and outside sales as well as indentifies high yielding products. **Id. at 94.** Diana related that through the Gulf reports she calculated a number of "scheme one," thefts. **Id. at 94-95.** For example, she showed a $300.00 dollar discrepancy between the Defendant's April 20, 2014 Excel spreadsheet and the corresponding Gulf report at the Eynon location. **Id. at 104-106.** The Defendant's Excel spreadsheet showed inflated credit/debit card sales by $300.00 dollars. **Id. at 107.** Similarly, Diana showed discrepancies between the Defendant's April 30, 2014, Excel spreadsheet at the Jessup location and the Gulf report. **Id. at 110-115.**

9

Likewise, the Commonwealth introduced the Gulf reports and the Defendant's Excel spreadsheets at the Eynon location during the following periods: January 2015 through December 2015; January 2014 through December 2014; and January 2013 through December 2013. **Id. at 119-122.** The Commonwealth also introduced the Gulf reports and the Defendant's Excel spreadsheets at the Jessup location during the following periods: January 2015 through December 2015; January 2014 through December 2014; and January 2013 through December 2013. **Id. at 122-123.**

Importantly, the Commonwealth introduced a detailed theft analysis that illustrated each date and the amount of cash stolen. **Id. at 124.** Diana corroborated the theft analysis showing the Defendant's forced balancing, and ultimate "scheme one," and "scheme two" thefts. **Id. at 125-126.** She testified that the Defendant's vacation days coincided with days that there was no forced balancing or thefts. **Id. at 130.** However, in May 2015, Diana recalled a "scheme one" theft occurred daily. She admitted that the extent of "scheme two" thefts could not be established because those tills were destroyed. **Id. at 131-132.** Diana's final calculation of "scheme one" and "scheme two" thefts amounted to a total theft of $525,537.87. **Id. at 132.**

Vanessa Goodfield (hereinafter "Vanessa"), graduated from Temple University in 2014, and became the general manager of Cousin's Convenient Marts. **See N.T. November 2, 2017, at p. 154-155.** Vanessa testified that her responsibilities included ordering food and beverage products, meeting with vendors, pricing, counting cash, reconciling the actual cash bags, and assisting Lorraine. **Id. at 155.** Vanessa learned through the Defendant how to reconcile the actual cash bags. **Id.** Specifically, Vanessa trained with the Defendant from June 9, 2014 through June 11, 2014. **Id. at 159-162.** Vanessa noted that no thefts occurred on these dates. **Id. at 163.**

10

Lastly, Detective Lisa Bauer, of the Lackawanna County District Attorney's Office who testified that in December 2015, the Goodfield family presented various documents to substantiate the Defendant's theft methods. **See N.T. November 6, 2017 (AM), p. 9-12.** As part of her investigation, Detective Bauer interviewed the Defendant at her office. **Id. at 13.** Detective Bauer inquired about the Defendant's duties and responsibilities at Cousin's Convenient Marts. She noted that the Defendant abruptly concluded the interview when she questioned her about the discrepancies in the actual cash sales and credit/debit card sales as well as the altered Excel spreadsheets. **Id. at 13-17.** Detective Bauer testified that she consulted with an accountant, and discovered a second theft scheme. **Id. at 19.** Initially, Detective Bauer related that the Defendant stole small amounts of cash until she became more comfortable with the cash bag routine and the Goodfield family. **Id. at 21.** She testified that the thefts occurred between 2013-2015, when the Defendant's annual salaries totaled $11,242.50, $10,045, and $10,790 respectively. **Id. at 22.** She gave detailed and extensive testimony regarding the Defendant's financial records, including the Defendant's boyfriend's annual salary and settlement sum. **Id. at 23-24.** Detective Bauer testified that between 2013 and 2015, the Defendant deposited approximately $186,563.21 in cash into her personal savings account. In addition, the Defendant deposited $263,669.98 into her personal checking account. **Id. at 33-34.** After arrest, the Defendant's cash deposits reduced to $6,524. **Id. at 35.** In fact, Detective Bauer testified that because of insufficient funds, the Defendant's bank account is now closed. **Id. at 36.**

Detective Bauer detailed the Defendant's financial transactions and spending history. She explained that the Defendant utilized her bank account for vehicle payments and vehicle purchases. **Id. at 39-41, 45-46.** For example, Detective Bauer noted that on July 16, 2015, the Defendant deposited $42,650.00 in cash into her personal checking account. **Id. at 50.** On that

11

same day, the Defendant paid $34,171.31 via a personal check towards a remaining vehicle. **Id. at 52-53.** Shortly thereafter, the Defendant paid $30,000.00 via personal check towards a down payment on a new home. **Id. at 53-54.** Detective Bauer testified that during the theft schemes, the Defendant utilized her bank account to make payments on approximately nine (9) major credit cards. **Id. at 54-55.** She also testified that during the theft schemes, the Defendant owed and paid approximately thirty (30) creditors. Detective Bauer noted that since arrest all of the Defendant's credit accounts are delinquent, and her house is in foreclosure. **Id. at 59-60, 63.** Detective Bauer opined that the Defendant would transfer stolen funds into her boyfriend's bank account, and subsequently back again into her own as a means to "cause confusion." **Id. at 68-69.** Ultimately, she concluded that the Defendant stole approximately $525,000.00 in cash sales from Cousin's Convenient Marts, while the Defendant and her boyfriend held a combined amount of $374,117.00 consisting of cash deposits in their personal bank accounts. **Id. at 77.** Also, Detective Bauer concluded that the Defendant utilized approximately $150,000.00 of untraceable cash to purchase various items, without ever depositing the money into her bank account. **Id. at 78.**

The Defendant then took the stand in her own defense; she testified as to her hiring, training, and duties while employed by the Goodfields. **N.T. Trial, November 6, 2017 (PM) at p. 41-45.** She explained her process for collecting and processing the bags for the data entry to create the spreadsheets. **Id. at 45-53.** The Defendant cited sources such as her fiancé's income and savings with respect to her financial records showing significant cash flow. **Id. at 66-67.** She noted that her fiancé did not have access to a bank prior to moving to this area. **Id. at 67.** The Defendant stated that the frequent transactions associated with her bank account were attempts to build credit to buy a home and explained her shuffling of funds in order to pay off debts. **Id. at**

12

68-71. The Defendant also told the jury that she used her bank account to receive funds and to pay her adult daughter's bills, including car payments and insurance. **Id. at 75-76.**

After deliberations, the jury convicted the Defendant of one (1) count of Theft by Unlawful Taking – In Excess of $100,000 but Less Than $500,000.00, and one (1) count of Tampering With Records. This Court requested a pre-sentence investigation report, and upon review of the thorough report as well as consideration of the sentencing guidelines including all mitigating and aggravating factors, this Court sentenced the Defendant on January 30, 2018 as follows:

> 16 CR 464, CT 1 – Theft by Unlawful Taking: thirty-six (36) – seventy-two (72) months, with three (3) years probation
> 16 CR 464, CT3 – Tampering With Evidence: seventeen (17) – thirty-six (36) months, with two (2) years probation, consecutive to Count 1.

Moreover, since the Defendant was on supervision during the commission of the underlying offense, this Court revoked the Defendant's original sentences and re-sentenced as follows:

> 01 CR 70,    CT 3: six (6) - twelve (12) months, with three (3) years probation
> 01 CR 1750, CT 2: six (6) - twelve (12) months, with three (3) years probation
> 01 CR 1751, CT 2: six (6) - twelve (12) months, with three (3) years probation
> 03 CR 1094, CT 1: six (6) - twelve (12) months, with three (3) years probation

All sentences were deemed consecutive, and aggregated to seventy-seven (77) to one hundred and fifty-six (156) months of incarceration followed by seventeen (17) years of probation to be supervised by the Pennsylvania Board of Probation and Parole.

## DISCUSSION

### I.    THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE VERDICT

13

Issues one through three question whether the evidence presented at trial was sufficient as a matter of law to establish every element of theft by unlawful taking and tampering with records, beyond a reasonable doubt. The Defendant further challenged whether the evidence presented at trial was sufficient since the evidence was solely based upon the testimony of the victims, rather than a forensic accountant. Upon review of the record, including the testimony and evidence presented at trial, this Court concludes as a matter of law that the evidence was sufficient to support the jury's verdict.

A claim challenging the weight of the evidence concedes the sufficiency of the evidence. See Commonwealth v. Widmer, 744 A.2d 745 (Pa. 2000). The Defendant did not assert either claim in the alternative therefore, the Defendant's challenge as to the sufficiency of the evidence claim should be denied. The standard of review regarding a sufficiency of the evidence claim requires a determination as to "whether the evidence, viewed in the light most favorable to the Commonwealth, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt." Commonwealth v. Laird, 988 A.2d 618, 624 (Pa. 2010) citing Commonwealth v. Watkins, 843 A.2d 1203, 1211 (Pa. 2003). See also, Commonwealth v. Rivera, 983 A.2d 1211, 1220 (Pa. 2009) (whether viewing all evidence and reasonable inferences viewed in favor of the Commonwealth as verdict winner establishes all elements of the offense beyond a reasonable doubt).

Under this standard, the fact-finder is given deference and the appellate court may not substitute its own judgment for the fact-finder. Moreover, the Commonwealth need not preclude every possibility of innocence. Rather, the appellate courts are instructed:

> any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable

14

doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

<u>Commonwealth v. DiStefano</u>, 782 A.2d 574, 582 (Pa. Super. 2001)

In the present case, the Commonwealth alleged that between January 12, 2013 and December 3, 2015, the Defendant stole funds in excess of $100,000.00 but less $500,000.00, that were the property of the Goodfield Convenient Stores, d/b/a Cousin's Convenient Marts, and that the Defendant took those funds with the intent to deprive the Goodfields thereof in violation of 18 Pa. C.S. § 3921(a), Theft By Unlawful Taking. **See Amended Criminal Information, Count 1.** The Commonwealth also alleged that between January 12, 2013 and December 3, 2015, the Defendant stole funds in excess of $500,000.00, that were the property of the Goodfield Convenient Stores, d/b/a Cousin's Convenient Marts, and that the Defendant took those funds with the intent to deprive the Goodfields thereof in violation of 18 Pa. C.S. § 3921(a), Theft By Unlawful Taking. **See Amended Criminal Information, Count 2.** Additionally, the Commonwealth alleged that, between January 12, 2013 and December 3, 2015, knowing she had no authority to do so, the Defendant, while employed as a bookkeeper for Cousin's Convenient Marts, did falsify Excel spreadsheets with the intent to deceive or conceal that she took unlawful control over funds in excess of $100,000.00 but less $500,000.00, that were the property of the Goodfield Convenient Stores d/b/a Cousin's Convenient Marts in violation of 18 Pa. C.S. § 4104(a), Tampering With Records. **See Amended Criminal Information, Count 3.** Lastly, the Commonwealth alleged that, between January 12, 2013, and December 3, 2015, knowing she had no authority to do so, the Defendant, while employed as a bookkeeper for Cousin's Convenient Marts, did falsify Excel spreadsheets with the intent to deceive or conceal that she took unlawful

15

control over funds in excess of $500,000.00, that were the property of the Goodfield Convenient Stores d/b/a Cousin's Convenient Marts in violation of 18 Pa. C.S. §4104(a), Tampering With Records. See Amended Criminal Information, Count 4.

Following witness testimony and the presentation of evidence, the jury convicted the Defendant of one (1) count of Theft by Unlawful Taking in violation of 18 Pa. C.S. § 3921(a) and one (1) count of Tampering With Records in violation of 18 Pa. C.S. § 4104(a).

Pursuant to 18 Pa. C.S. § 3921(a): "a person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." Pursuant to 18 Pa. C.S. § 4104(a): "[a] person is guilty of tampering with records [when] "knowing that [s]he has no privilege to do so, [s]he falsifies, destroys, removes or conceals any writing or record, or distinguishing mark or brand or other identification with intent to deceive or injure anyone or to conceal any wrongdoing." The Commonwealth may prove any or all elements of a crime by circumstantial evidence. **Commonwealth v. Alvarado**, 481 A.2d 1223, at 1225 (Pa. Super. 1984); See also **Commonwealth v. Cichy**, 323 A.2d 817, 818 (Pa. Super. 1974) citing **Commonwealth v. Bailey**, 292 A.2d 345, 346 (Pa. 1972)(finding that the Commonwealth need not "establish guilt to a mathematical certainty" and a case may rest entirely upon circumstantial evidence, as long as the conviction is based on more than conjecture)

In the present case, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the evidence was sufficient to prove the elements of Theft by Unlawful Taking and Tampering with Records, beyond a reasonable doubt. First, learning the business' practices through her training with Larry, the Commonwealth demonstrated the Defendant's familiarity with Excel spreadsheet data entry and accounting methods. In her capacity as bookkeeper, the Defendant altered the actual cash sales data to conceal her theft

16

schemes. Lorraine, the owner of Cousin's Convenient Marts, and Diana, the business manager of Cousin's Convenient Marts testified that Larry hired the Defendant as a bookkeeper prior to death. Both Lorraine and Diana offered parallel testimony as to their reliance on the Defendant, and her employment responsibilities, the Defendant's knowledge of data entry, and her opportunity to commit the theft schemes. See N.T. Trial, November 1, 2017, at p. 42-46; N.T. Trial, November 2, 2017, at p. 28-29. Lorraine testified as to the Defendant's role and duties within the store, as well as her exclusive access to the cash bag drops and safe key. Id. at p. 54. In fact, Lorraine and Diana testified that both eliminated any alternative causes of cash loss. See N.T. Trial, November 1, 2017, at p. 98; N.T. Trial, November 2, 2017, at p. 45-50. Diana described the methods she employed to discover the Defendant's theft schemes as well as the actual cash sales stolen. N.T. Trial, November 2, 2017 at p. 45-47. Lorraine's testimony regarding the discovery of the Defendant's theft schemes corroborated Diana's investigation of the cash loss. N.T. Trial, November 1, 2017 at p. 93-94; 98-102. Diana explained that during one shift, she completed the Defendant's duties before the Defendant and then compared her personal data entry to the Defendant's version. Through this comparison, Diana uncovered discrepancies between actual cash sales and credit/debit card sales. N.T. Trial, November 2, 2017, at p. 51-53. She discussed her review of the cash register tapes, which confirmed that the Defendant stole a portion of the actual cash sales and inflated the credit/debit card sales so that the total amount balanced. Id. at 56. As a result, Diana compared the Defendant's previous data entries and discovered numerous instances where the actual cash sales were short while the credit/debit card sales were increased by the same amount as the missing cash. Id. at 57.

She further discussed the importance of a till report. Id. at 69. Diana testified that the till reports independently verified the actual cash sales by utilizing the cash number from the till and

17

comparing it to the cash plus the owes, less the safe drops, on the Excel spreadsheet. **Id. at 74-75.** In particular, Diana referenced the December 3, 2015 report to show the jury how she completed her own actual cash sale entry versus the Defendant's actual cash sale entry. She testified that her actual cash sales calculation was missing $90.00 while the Defendant's credit/debit card sales calculation was increased by $90.00. **Id. at 79-83.** Diana reported that several past tills were destroyed or otherwise missing, however she indicated that actual cash sales and credit/debit card sales could be independently verified through the Gulf Oil Company reports despite the missing till reports. **Id. at 93.** Diana explained that the Gulf Oil Company's reports were generated daily through the Gulf Oil Company network and included inside sales and outside sales, as well as high yielding products. **Id. at 94.** She used the Gulf Oil Company reports to detect several of the Defendant's thefts. **Id. at 94-95.** Most importantly, Diana used the Gulf Oil Company reports to calculate the total amount of the Defendant's thefts. Diana demonstrated her calculations for the jury showing the actual cash sales compared to the Defendant's manipulated entries. **Id. at 99-102, 104-107, 110-115.** She testified that, with her sister Vanessa, she compiled all of the actual cash sales and determined the total theft amount, which was re-calculated and corroborated by Detective Lisa Bauer and an accountant. **Id. at 166.** In support of Diana's testimony, the Commonwealth introduced the Gulf Oil Company reports and corresponding Excel spreadsheets entered by the Defendant at the Eynon location for January 2015 through December 2015; January 2014 through December 2014; January 2013 through December 2013. **Id. at 119-122.** The Commonwealth also presented the Gulf Oil Company reports and corresponding Excel spreadsheets entered by the Defendant regarding the Jessup location during 2013, 2014, and 2015. **Id. at 122-123.** Finally, the Commonwealth presented an extensive theft analysis generated by Diana, which itemized all of the dates and cash stolen. **Id. at 123-124.** Diana remarked that

18

during the Defendant's period of vacation, the Excel spreadsheets showed no forced balanced or thefts. **Id. at 130.** She concluded the Defendant's total theft schemes amounted to $525,537.87. **Id. at 132.**

In light of her history and experiences investigating financial thefts, Detective Bauer corroborated the Goodfield family's suspicions and determined that a series of thefts occurred at Cousin's Convenient Marts. **See N.T. November 6, 2017 (AM), p. 12.** Detective Bauer confirmed that the Defendant altered the Excel spreadsheets by inflating the credit/debit card sales, lowering the actual cash sales, and pocketing a portion of the cash. Detective Bauer described the Defendant's theft schemes as "common" methods utilized by bookkeepers. **Id. at 12-13.** She reviewed all the evidence with an accountant, who substantiated the Defendant's theft schemes of lowering the actual cash sales and increasing the credit/debit card sales. Detective Bauer also discussed her investigation of the Defendant's lengthy debt history and modest income, compared to an increasingly large cash flow, extensive spending, vehicles, vacations and an upgraded new home. Detective Bauer testified that after the Defendant's arrest, the large cash flow evaporated. **N.T. Trial, November 6, 2017 (AM), at p. 7, 22-58.**

Therefore, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence presented at trial is sufficient to support the jury's verdict, where Lorraine, Diana, and Vanessa all testified to the Defendant's role as bookkeeper, including her duties and knowledge of Excel spreadsheets and cash bag routines. The Goodfields testified as to the amount of stolen cash sales, the length of time the thefts occurred, the manipulated spreadsheets as well as the independent Gulf Oil Company reports. The Commonwealth presented extensive evidence of the Defendant's theft schemes compared to the independent sources which verified cash loss and the inflated credit/debit card sales. Ultimately, the evidence shows that the Defendant exercised

19

control over significant portions of actual cash sales, which she unlawfully stole from Cousin's Convenient Marts and intended to deprive the Goodfield family of their property. As such, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence is sufficient to establish (1) thefts of actual cash sales from Cousin's Convenient Marts; (2) that the thefts occurred through forced balancing of the business' Excel spreadsheets; (3) that the Defendant was responsible for the thefts in excess of $100,000.00 but less than $500,000.00; (4) that the Defendant's actions were intentional and deceitful; and (5) and that the Defendant falsified the records in an attempt to conceal the thefts.

Therefore, upon review of the applicable case law and the evidence presented at trial, this Court finds that the evidence presented at trial was sufficient to support the jury verdict of guilty on Count 1, Theft by Unlawful Taking in violation of 18 Pa. C.S.A. § 3921(a), and Count 3, Tampering With Records in violation of 18 Pa. C.S.A. § 4104(a).

## II. THE VERDICT WAS NOT CONTRARY TO THE WEIGHT OF THE EVIDENCE

Issues four through six challenge the jury's verdict as against the weight of the evidence. The Defendant asserts that the evidence relied solely on the testimony of the victims, rather than a forensic accountant.

Determination of whether a verdict is against the weight of the evidence is within the discretion of the trial court. **Commonwealth v. Widmer**, 744 A.2d 745, 751–52 (Pa. 2000) citing **Commonwealth v. Brown**, 648 A.2d 1177 (Pa. 1994). A claim that a verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. **Id.** citing **Commonwealth v. Whiteman**, 485 A.2d 459 (Pa. Super. 1984). A weight-of-the-evidence claim under Pa. R. Crim. P. 607 requires the defendant to show that the verdict is so contrary to the evidence as to shock one's sense of justice. **Commonwealth v. Boyd**, 73 A.3d

20

1269, 1275 (Pa. Super. 2013) (citations omitted). The role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." Commonwealth v. Widmer, 744 A.2d 745, 751–52 (Pa. 2000) (citing Thompson v. City of Philadelphia, 493 A.2d 669, 673 (Pa. 1985).

Here, as discussed above, this Court found sufficient evidence to support the jury's verdict. The fact that the verdict was largely based upon the testimony of the victims, rather than a forensic accountant, does not justify overturning the jury's verdict. The victims and detective detailed the analysis and demonstrated the calculations for the jury. The Commonwealth presented the testimony of multiple witnesses that was consistently sufficient to establish the Defendant's guilty. The evidence convinced the jury beyond a reasonable doubt to convict the Defendant of the crimes charged. The Defendant has not presented any colorable argument in support of her weight of the evidence claim. The Defendant has not pointed to any fact that should clearly be given greater weight or demonstrated that the verdict is contrary to the evidence as to shock one's sense of justice. See Boyd, *supra*, and Widmer, *supra*.

Therefore, the verdict at trial was not against the weight of the evidence, as no evidence presented weighed so heavily against the verdict as to shock ones sense of justice.

III.    THE COMMONWEALTH PROPERLY AMENDED THE CRIMINAL INFORMATION

Issue seven contends that the trial Court erred or abused its discretion in allowing the Commonwealth to amend the Criminal Information as it increased both the grading and penalty of the offenses charged. The amendment was proper under the Pennsylvania Rules of Criminal

21

Procedure, and the Defendant suffered no prejudice. The Pennsylvania Rules of Criminal Procedure provide the following regarding amendment of a Criminal Information:

> The court may allow an information to be amended, provided that the information as amended does not charge offenses arising from a different set of events and that the amended charges are not so materially different from the original charge that the defendant would be unfairly prejudiced.

**Pa. R. Crim. P. 564.**

Unfair prejudice may be determined by the following six factors: (1) whether amendment changes the factual basis for the charges; (2) whether the amendment adds new facts previously unknown to the defendant; (3) whether the factual scenario was developed during the preliminary hearing; (4) whether the amendment changed the description of the charges; (5) whether a change in defense strategy was necessary; and (6) whether the timing of the amendment allowed ample notice and preparation. **Commonwealth v. Witmayer, 144 A.3d 949 (Pa. Super. 2016); Commonwealth v. Veon, 109 A.3d 754 (Pa. Super. 2015).** The mere possibility amendment of an information may result in a more severe penalty due to addition of charges is not, of itself, prejudice for purposes of determining whether to permit an amendment of an information. **Commonwealth v. Picchianti, 600 A.2d 597, (Pa. Super. 1991).**

On October 16, 2017, nearly one (1) month prior to the commencement of trial, the Commonwealth amended the Criminal Information. In comparison, the previous Criminal Information charged the Defendant with one (1) count of Theft by Unlawful Taking in violation of 18 Pa. C.S. § 3921(a) (F2), one (1) count of Receiving Stolen Property in violation of 18 Pa. C.S. § 3925 (F2), and one (1) count of Tampering With Records in violation of 18 Pa. C.S. § 4104(a) (M1). The amended Criminal Information charged the Defendant with two (2) counts of Theft by Unlawful Taking in violation of 18 Pa. C.S. § 3921(a), one count relative to an amount in excess of $100,000.00 but less than $500,000.00, and one count relative to an amount in excess

22

of $500,000.00. Similarly, the amended Criminal Information charged the Defendant with two (1) counts of Tampering With Records in violation of 18 Pa. C.S. § 4104(a) (M1), one count relative to an amount in excess of $100,000.00 but less than $500,000,00, and one count relative to an amount in excess of $500,000.00. All the criminal offenses in the amended Criminal Information arose from the same factual scenario wherein the Defendant was alleged to have abused her role as bookkeeper altering Excel spreadsheets without the authority to do so and unlawfully stealing cash with the intent to deprive the Goodfield family of their property. The criminal offenses in the amended Criminal Information specified monetary amounts, and were based upon the same factual circumstances previously alleged and not unknown to the Defendant. The Defendant had ample notice and opportunity to prepare without changing her defense strategy. As such, the Defendant was not unfairly prejudiced by the amended Criminal Information.

## IV. THIS COURT PROPERLY PRECLUDED THE DEFENDANT FROM PRESENTING TESTIMONY REGARDING AN ILLEGAL GAMBLING DEVICE

Issue eight contends that the trial Court erred or otherwise abused its discretion in precluding the Defendant from presenting evidence that Lorriane Goodfield operated illegal gambling devices in Cousin's Convenient Marts. .

The admissibility of evidence is within the discretion of the trial court and will only be reversed upon showing a clear abuse of discretion. **Commonwealth v. Drumheller, 808 A.2d 893, 904 (Pa. 2002),** *cert. denied,* **539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003)** (quoting **Commonwealth v. Stallworth, 781 A.2d 110, 117 (Pa. 2001)); Commonwealth v. Tyson, 119 A.3d 353, 357, appeal denied, 128 A.3d 220 (Pa. Super 2015).** An abuse of discretion is more than an error in judgment; it is a misapplication of the law or a showing that the exercise of judgment was "manifestly unreasonable, or the result of bias, prejudice, ill-will or

23

partiality, as shown by the evidence of record." Tyson, 119 A.3d at 357 quoting

Commonwealth v. Harris, 884 A.2d 920, 924 (Pa.Super.2005), *appeal denied*, 928 A.2d 1289

(Pa. 2007).

"Relevance" is the threshold requirement for the admissibility of evidence.

Commonwealth v. Cook, 952 A.2d 594, 612 (Pa. 2008). Evidence is relevant if: (a) it has any

tendency to make a fact more or less probable than it would be without the evidence; and (b) the

fact is of consequence in determining the action. Pa. R. E. 401. Under Pa. R. E. 403, a court may

exclude otherwise relevant evidence "if its probative value is outweighed by a danger of one or

more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence." Pa. R. E. 403.

The Defendant presented a motion in limine seeking to admit evidence of Lorraine

Goodfield's expunged ARD record regarding illegal gambling machines inside Cousin's

Convenient Marts. N.T. Motions, November 1, 2017, at p. 3. The Defendant sought to

introduce the existence of the illegal gambling machines as an additional source of income and to

question Lorraine's credibility. Id. at 4.

This Court found the evidence inadmissible since Lorraine could not be cross-examined

about the ARD record since the underlying offense was not crimen falsi. See. Pa. R. E. 609.

Importantly, the underlying offense was expunged. See Pa. R.E. 609, *comment* (evidence of

admission to an Accelerated Rehabilitative Disposition program under Pa. R. Crim. P. 310-

320 may not be used to attack credibility, citing Commonwealth v. Krall, 434 A.2d 99 (Pa.

Super. 1981)). Finally, the Defendant could not articulate the amount or type of income

generated by the illegal gambling machines to substantiate the relevance. Rather, the

Commonwealth confirmed that the illegal gambling machines were removed in 2012, prior to the

24

Defendant's theft schemes. As such, this Court found admission of Lorraine's ARD record irrelevant, lacking in probative value, and any reference would only cause juror confusion. This Court properly precluded the Defendant from admitting irrelevant and inadmissible evidence.

## V. THIS COURT PROPERLY ALLOWED THE TESTIMONY OF LORRAINE GOODFIELD REGARDING DIANA GOODFIELD AS AN EXCEPTION TO THE HEARSAY RULE

Issue nine contends that the trial Court erred as a matter of law or otherwise abused its discretion in permitting hearsay statements of Diana Goodfield through the testimony of Lorraine Goodfield, thereby depriving the Defendant of confrontation and a fair trial. The admissibility of evidence is within the discretion of the trial court and will only be reversed upon showing a clear abuse of discretion. Commonwealth v. Drumheller, 808 A.2d 893, 904 (Pa. 2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting Commonwealth v. Stallworth, 781 A.2d 110, 117 (2001)); Commonwealth v. Tyson, 119 A.3d 353, 357, appeal denied, 128 A.3d 220 (Pa. Super. 2015). An abuse of discretion is more than an error in judgment; it is a misapplication of the law or a showing that the exercise of judgment was "manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." Tyson, 119 A.3d at 357 quoting Commonwealth v. Harris, 884 A.2d 920, 924 (Pa. Super. 2005), *appeal denied*, 928 A.2d 1289 (Pa. 2007).

"Relevance" is the threshold requirement for the admissibility of evidence. Commonwealth v. Cook, 952 A.2d 594, 612 (Pa. 2008). The Pennsylvania Rules of Evidence provide the framework regarding admissible evidence. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Pa. R. E. 401. As the Pennsylvania Supreme Court explained: "Evidence is relevant if it logically tends to establish a material fact in the case,

25

tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Drumheller**, *supra* at 904.

Moreover, all relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible. **Pa. R. E. 402.** Notwithstanding, hearsay evidence is generally inadmissible. **See Pa. R. E. 801 and 802.** However, the Pennsylvania Rules of Evidence provide certain exceptions to hearsay evidence. **See Pa. R. E. 803.** One exception is an excited utterance. **Id.** An excited utterance is "a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." **See Pa. R. E. 803(2).** An exited utterance need not describe or explain the event, but only relate to it and it need not be contemporaneous to the event. **See Pa. R. E. 803(2),** *comment.* The timing of the statement is crucial and must show that: "the nervous excitement continues to dominate while the reflective processes remain in abeyance." **Id.** quoting **Commonwealth v. Gore**, 396 A.2d 1302, 1305 (Pa. Super. 1978). The determination of an excited utterance is fact specific and determined on a case-by-case basis. **Commonwealth v. Wholaver**, 989 A.2d 883 (Pa. 2010). Factors trial courts should consider are whether the statement was a narrative; the time elapsed between the occurrence and the utterance; and whether the declarant had the opportunity to or did speak to others. **Commonwealth v. Carmody**, 799 A.2d 143, 147 (Pa. Super. 2002) citing **Commonwealth v. Sanford**, 580 A.2d 784, 788 (1990), *appeal denied*, 588 A.2d 508 (Pa. 1991).

The Defendant objected during Lorraine's testimony when she explained that she "followed the money" with her daughter Diana. **N.T. Trial, November 1, 2017, at p. 98-102.** Lorraine explained that Diana completed the Defendant's data entry duties for one shift prior to the Defendant entering her own data. **Id. at 99-100.** Lorraine testified as to what Diana told her

26

when she entered the store after Diana compared her own Excel spreadsheet to the Defendant's Excel spreadsheet. **Id. at 100-101.** Defense counsel objected to Lorraine's testimony as hearsay. In response, the Commonwealth argued that Lorraine's testimony should be admitted as an exception to the hearsay rule, under the excited utterance exception. **Id. at 101.** This Court allowed limited testimony regarding Diana's discovery of the Defendant's theft schemes as a hearsay exception. Lorraine testified that her and Diana investigated potential reasons for the cash losses and when she entered the store, Diana told her to brace herself since she discovered that the Defendant had been altering the Excel spreadsheets. **Id. at 98-102.** Lorraine reacted and stated: "oh, my God, oh, my God, Shelia was the one." **Id. at 102.**

Lorraine's testimony related to the excitement and emotional impact of discovering the Defendant as the culprit and the shock did not wear off as Diana explained the theft schemes. Therefore, this Court properly allowed Lorraine's limited testimony as to how Diana discovered the Defendant's theft schemes as her reaction fell within the exited utterance exception to hearsay.

Moreover, any error in allowing the testimony is harmless, as Diana also testified and was available for cross-examination to reveal any discrepancies or inaccuracies.

## VI. THIS COURT PROPERLY ADMITTED THE DEFENDANT'S PRIOR BAD ACTS, CRIMINAL CONVICTIONS, AND CIVIL JUDGMENTS

Issues ten and eleven argue that the trial Court erred or abused its discretion in admitting evidence of the Defendant's prior convictions for theft by deception and bad checks. The Defendant contends that this evidence was barred by Pa. R. E. 404(a)(1) and 404(b)(1), and was otherwise inadmissible as it was not relevant, and unfairly prejudiced the Defendant. Similarly, issues twelve and thirteen argue that the trial Court erred or abused its discretion in admitting evidence of civil claims and judgments against the Defendant in violation of Pa. R. E. 404(a)(1)

27

and 404(b)(1), and that the evidence was otherwise inadmissible irrelevant, and unfairly prejudicial under Pa. R. E. 401 and 403.

Under Pennsylvania law, the admissibility of evidence is within the discretion of the trial court and will only be reversed upon showing a clear abuse of discretion. Commonwealth v. Drumheller, 808 A.2d 893, 904 (Pa. 2002), *cert. denied,* 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting Commonwealth v. Stallworth, 781 A.2d 110, 117 (Pa. 2001)); Commonwealth v. Tyson, 119 A.3d 353, 357, appeal denied, 128 A.3d 220 (Pa. Super. 2015). An abuse of discretion is more than an error in judgment; it is a misapplication of the law or a showing that the exercise of judgment was "manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." Tyson, 119 A.3d at 357 quoting Commonwealth v. Harris, 884 A.2d 920, 924 (Pa. Super. 2005), *appeal denied,* 928 A.2d 1289 (Pa. 2007).

"Relevance" is the threshold requirement for the admissibility of evidence. Commonwealth v. Cook, 952 A.2d 594, 612 (Pa. 2008). The Pennsylvania Rules of Evidence provide the framework regarding admissible evidence. Pennsylvania Rule of Evidence 401 provides the test for relevant evidence.

> **Rule 401. Test for Relevant Evidence**
> Evidence is relevant if:
> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
> (b) the fact is of consequence in determining the action.

Pa.R.E. 401.

The Pennsylvania Rules of Evidence further state: "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa. R. E. 402. Pa.R. E. 403 explains limitations for Pa. R. E. 402:

28

The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Pa.R.E. 403.

Pa. R. E. 404 governs the admissibility of evidence regarding a person's character, other crimes or bad acts. Pa. R. E.404(b) states:

> **Rule 404. Character Evidence; Crimes or Other Acts**
> **(a) Character Evidence.**
> *(1) Prohibited Uses.* Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.
> *(2) Exceptions for a Defendant or Victim in a Criminal Case.* The following exceptions apply in a criminal case:
> > (A) a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;
>
> . . .
>
> **(b) Crimes, Wrongs or Other Acts.**
> *(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> *(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.
> *(3) Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b).

As such, the admissibility of evidence of a prior crime, wrong, or other bad acts first depends upon the purpose for which it is being offered. Character or prior bad act evidence is not admissible for the purpose of demonstrating the defendant's propensity to commit crimes or to suggest that the defendant acted in conformity therewith. **Commonwealth v. Melendez-**

Rodriguez, 856 A.2d 1278, 1283 (Pa. Super. 2004). However, such evidence can be admitted "in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken the defendant's character." Id. Specifically, other crimes evidence is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. Commonwealth v. Tyson, 119 A.3d 353, 357–60, appeal denied, 128 A.3d 220 (Pa. 2015) (citing Commonwealth v. Chmiel, 889 A.2d 501 (2005). If such evidence is offered for a legitimate purpose, the evidence of prior bad acts is admissible if the probative value outweighs the risk of unfair prejudice. Id. citing Commonwealth v. Hairston, 84 A.3d 657 (2014), *cert. denied,* —— U.S. ——, 135 S.Ct. 164, 190 L.Ed.2d 118 (2014).

When determining the probative value versus risk of unfair prejudice, a cautionary jury instruction "may ameliorate the prejudicial effect of the proffered evidence.... Jurors are presumed to follow the trial court's instructions." Id. quoting Hairston, *supra* at 666 (holding extraneous offense of arson was admissible under Rule 404(b) as res gestae evidence in prosecution for murder; trial court's instruction on how arson evidence should be considered minimized likelihood that arson evidence would inflame jury or cause it to convict defendant on improper basis).

Additionally, under Pennsylvania law, a stipulation is a declaration that the fact agreed upon is proven. Commonwealth v. Rizzuto, 777 A.2d 1069, 1088 (Pa. 2001). Concessions made in stipulations are judicial admissions, and accordingly may not later in the proceedings be contradicted by the parties who make them. Commonwealth v. Rodebaugh, 519 A.2d 555, 561 (Pa. Cmwlth. 1986).

30

In the present case, the Commonwealth filed a motion in limine seeking to introduce the Defendant's prior bad acts, criminal convictions, collection claims, and insurance claims. The Commonwealth argued that these convictions and judgments should be permitted to show the Defendant's motive, opportunity, plan, preparation, intent, knowledge, identity, absence of mistake or accident.

At trial, the Defendant stipulated to the proposed testimony of Mauri Kelly, the Lackawanna County Clerk of Judicial Records, who if testifying would corroborate that the Defendant committed a series of theft-related criminal offenses with restitution owed in the amount of $57,000.00. **N.T. Trial, November 6, 2017 (PM), at p. 29-32.** The stipulation referenced a payment plan in which the Defendant would pay $170.00 dollars per month for twenty (20) years. **Id. at 32.** The stipulation also referenced twenty-five (25) Lackawanna County Civil Judgments in excess of $350,000.00 against the Defendant. **Id. at 33-36.**

Evidence of the Defendant's prior bad acts was not admitted to show conformity therewith, rather, to show motive, opportunity, plan, preparation, intent, knowledge, identity, absence of mistake or accident. The Defendant's history of theft-related offenses demonstrates the Defendant's knowledge and absence of a mistake in her commission of the underlying offenses. Additionally, the Defendant's requirement to pay outstanding restitution and civil judgments showed motive. Ultimately, the Defendant stipulated to the evidence of her civil judgments and prior criminal convictions. It is long established under Pennsylvania law that a stipulation is an agreed upon fact that need not be proven. As such, the Defendant's history was not improperly admitted as character evidence, but instead was appropriately admitted within the permitted uses. Moreover, the Defendant stipulated to the Clerk of Judicial Record's testimony as to the official

31

court history of the Defendant's convictions and judgments, as well as the amounts owed. Therefore, this evidence was properly admitted.

## VII. THIS COURT PROPERLY ALLOWED THE ADMISSION OF THE TILL REPORTS AND THEFT SUMMARY AS EVIDENCE

Issues fourteen and fifteen argue that the trial Court erred or otherwise abused its discretion in allowing evidence of the till reports and schedules prepared by Diana as lacking proper authentication and foundation. The admissibility of evidence is within the discretion of the trial court and will only be reversed upon showing a clear abuse of discretion. **Commonwealth v. Drumheller**, 808 A.2d 893, 904 (Pa. 2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (Pa. 2003) (quoting **Commonwealth v. Stallworth**, 781 A.2d 110, 117 (Pa. 2001)); **Commonwealth v. Tyson**, 119 A.3d 353, 357, **appeal denied**, 128 A.3d 220 (Pa. Super. 2015). An abuse of discretion is more than an error in judgment; it is a misapplication of the law or a showing that the exercise of judgment was "manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Tyson**, 119 A.3d at 357 quoting **Commonwealth v. Harris**, 884 A.2d 920, 924 (Pa. Super. 2005), *appeal denied*, 928 A.2d 1289 (Pa. 2007).

"Relevance" is the threshold requirement for the admissibility of evidence. **Commonwealth v. Cook**, 952 A.2d 594, 612 (Pa. 2008). The Pennsylvania Rules of Evidence provide the framework regarding the types of admissible evidence. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. **Pa. R. E. 401.**

Evidence is authenticated or identified if the proponent produces evidence sufficient to support a finding that the item is what the proponent claims it to be. **Pa. R. E. 901(a).**

32

Authentication of evidence is generally a low burden of proof. **Commonwealth v. Murray**, 174 A.3d 1147 (Pa. Super. 2017).

All relevant evidence is admissible, except as otherwise provided by law, while evidence that is not relevant is not admissible. **Pa. R. E. 402.** Hearsay evidence is generally inadmissible, yet the Pennsylvania Rules of Evidence allow evidence of a regularly conducted business activity as an exception to the hearsay rule. See **Pa. R. E. 803.**

Pa. R. E. 803(6) states:

> **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

**Pa. R. E. 803(6).**

Further, under the Uniform Business Records as Evidence Act,

> A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

**42 Pa. C.S.A. § 6108.**

Finally,

33

The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

Commonwealth v. Haas, No. 1858 MDA 2015, 2017 WL 376012, at *7 (Pa. Super. Ct. Jan. 26, 2017) citing Commonwealth v. Poplawski, 130 A.3d 697, 716 (Pa. 2015) (citations and quotation marks omitted).

Here, the till reports and Excel spreadsheets prepared by Diana are relevant and admissible. The Commonwealth presented evidenced that the till reports or register tapes were an independent source utilized to verify the actual cash sales. N.T. November 2, 2017, at p. 57. Diana testified that she compared the actual cash sales generated on the till reports to those cash sale entries in the Defendant's Excel spreadsheets. Diana explained that a till report corresponded with each shift. Id. at 69. She verified the actual cash sales independently by taking the cash number from the till report and comparing it to the cash plus the owes, less the safe drops, on the Excel spreadsheet. Id. at p. 74-75. She discussed the manner in which she utilized the till reports to prepare her own Excel spreadsheets, and illustrated the discrepancies in the Defendant's Excel spreadsheets. The till reports were authenticated by Diana as the business manager, and Diana also authenticated the theft analysis as its author. Moreover, the tills and Excel spreadsheets were records kept in Cousin's Convenient Marts regularly conducted business activities, generated on the respective dates. In particular, the theft analysis derived from the till reports and Excel spreadsheets compiled by Diana. Therefore, the documents were properly admitted by this Court. This Court discerns no abuse of discretion.

## VIII. THIS COURT PROPERLY ADMITTED THE AUTHENTICATED BANK DOCUMENTS

34

Issues sixteen and seventeen argue that the Defendant was prejudiced by the admission of bank documents received during trial, with inadequate time for review, and admitted in error as lacking authentication. The admissibility of evidence is within the discretion of the trial court and will only be reversed upon showing a clear abuse of discretion. **Commonwealth v. Drumheller,** 808 A.2d 893, 904 (Pa. 2002), *cert. denied,* 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting **Commonwealth v. Stallworth,** 781 A.2d 110, 117 (Pa. 2001)); **Commonwealth v. Tyson,** 119 A.3d 353, 357, *appeal denied,* 128 A.3d 220 (Pa. Super. 2015). An abuse of discretion is more than an error in judgment, rather a misapplication of the law or a showing that the exercise of judgment was "manifestly unreasonable," or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Tyson,** 119 A.3d at 357 quoting **Commonwealth v. Harris,** 884 A.2d 920, 924 (Pa. Super. 2005), *appeal denied,* 928 A.2d 1289 (2007).

"Relevance" is the threshold requirement for the admissibility of evidence. **Commonwealth v. Cook,** 952 A.2d 594, 612 (Pa. 2008). The Pennsylvania Rules of Evidence provide the framework regarding the types of admissible evidence. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. **Pa. R. E. 401.** As the Pennsylvania Supreme Court explained: "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Drumheller,** *supra* at 904. All relevant evidence is admissible, except as otherwise provided by law and evidence that is irrelevant is not admissible. **Pa. R. E. 402.**

Specifically, evidence is authenticated or identified if the proponent produces evidence sufficient to support a finding that the item is what the proponent claims it to be. Pa. R. E. 901(a); Commonwealth v. Rabelow, No. 2985 EDA 2014, 2016 WL 963812, at *12 (Pa. Super. Ct. Mar. 14, 2016) (Agent testimony as to how records were obtained was sufficient authentication). Authentication of evidence is generally a low burden of proof. Commonwealth v. Murray, 174 A.3d 1147 (Pa. Super. 2017).

On November 1, 2017, the Defendant filed a Motion to Quash a subpoena that the Commonwealth had obtained to retrieve the bank records of the Defendant's fiancé, Thomas Aragon , a/k/a "T.C." The Commonwealth admitted that the bank documents arrived on November 1, 2017. Immediately, the Commonwealth produced copies of the bank documents for the Defendant. Id. at 3, 176. The Commonwealth intended the bank documents to demonstrate where the stolen cash was deposited as well as the Defendant's control, use, disbursement of the stolen cash she siphoned through her boyfriend's account and back into her personal account. Id. at 3-4, 6. This Court granted the Defendant three (3) days to review and prepare any motions in limine seeking to limit use of the bank documents. Id. at 176-176. Accordingly, the Defendant orally objected to the admission of the bank documents due to the lateness, size, and authentication. N.T. Trial, November 6, 2017 (AM), at p. 7. This Court held that the Commonwealth could introduce the bank documents since cross-examination would provide the Defendant an opportunity to question their authenticity as well as demonstrate other sources of the Defendant's income. Id. at 7-8.

During trial, the Commonwealth introduced the bank documents through Detective Bauer, who explained that she utilized the bank documents to explore other sources of the Defendant's income. Id. at 22-23. Detective Bauer testified that a review of the Defendant and her

36

boyfriend's banking transactions revealed the Defendant's method of concealing the stolen cash. **Id. at 26.** Detective Bauer testified that the Defendant opened a Wells Fargo checking account and deposited a settlement check in the amount of $36,730.22. Detective Bauer noted that this transaction was verified by the bank. **Id. at 24-25;** Detective Bauer further explained that with this settlement check the Defendant deposited $30,000.00 into her own Wells Fargo savings account, and the remaining $6,730.22 into her Wells Fargo checking account. **Id. at 25-26.** On another occasion, Detective Bauer stated that the Defendant withdrew $25,000.00 in cash from her savings account and her boyfriend opened a Wells Fargo checking account depositing cash in the same dollar amount of $25,000.00. **Id. at 27-29.**

Detective Bauer testified at length about the Defendant's Wells Fargo checking account. **Id. at 30.** She stated that she prepared a summary of the Defendant's Wells Fargo checking and savings accounts beginning on April 16, 2013, when the Defendant initiated her theft schemes. **Id. at 31-32.** Detective Bauer summarized the Defendant's cash deposits, and testified that in 2013, the Defendant deposited $16,521.00 in cash into her Wells Fargo checking account. In 2014, the Defendant deposited $56,237.21 in cash, and in 2015, the Defendant deposited $113,805.00 in cash. Over a two and half year period, the Defendant's cash deposits totaled $186,563.21. **Id. at 33-34.** The total cash deposits during the Defendant's entire theft period amounted to $263,669.98. **Id. at 35.** Detective Bauer testified that in the year of the Defendant's arrest, the Defendant's cash deposits into her Wells Fargo account totaled $6,524.00. She noted that the Defendant's Wells Fargo account was later closed due to insufficient funds. **Id. at 35-37.** Detective Bauer also prepared a summary of transactions which showed the Defendant siphoned cash out through personal checks, cash withdrawals, or debit transactions. **Id. at 36-37.** For example, Detective Bauer testified that in 2013, the Defendant issued personal checks totaling

37

amount of $9,698.64, in 2014, $21,950.20, and in 2015, $84,427.76. The total amount of personal checks issued by the Defendant during her theft schemes totaled $116,076.60. **Id.** Detective Bauer testified that during the Defendant's theft schemes, the Defendant's withdrawals in 2013 totaled $17,290.79, and in 2014 $27,166.80. **Id. at 55.**

Therefore, the bank documents are relevant and admissible to show the Defendant's control over the stolen cash through depositing and spending cash far beyond her available income. The bank documents were also relevant to contradict the Defendant's theory that her boyfriend contributed to the substantial amounts of cash flowing into her Wells Fargo account. In fact, the Defendant utilized "T.C.'s" salary contribution when cross-examining Detective Bauer. **N.T. Trial, November 6, 2017 (PM) at p. 19-10.**

Finally, Detective Bauer referenced the bank's authentication of the account records throughout her testimony. Detective Bauer testified that she obtained the account records from the bank via court order and acknowledged that the account records were what the bank purported them to be. **See Pa. R. E. 901(a); Commonwealth v. Rabelow,** *supra.* In response, the Defendant questioned Detective Bauer on her lack of specific knowledge as to exactly how the cash was spent. **N.T. Trial, November 6, 2017 (PM) at p. 19-10.** As such, the bank documents were properly admitted.

## IX. THIS COURT PROPERLY ADMITTED DETECTIVE BAUER'S TESTIMONY ABOUT DATE DISCREPANCIES AND LIMITED CROSS-EXAMINATION TO THE CONTROLLING DOCUMENT

Issue eighteen argues that the trial Court erred or otherwise abused its discretion in admitting hearsay testimony regarding the conclusions of the Commonwealth's accountant referenced by Detective Bauer.

Hearsay evidence is generally inadmissible, unless it falls within an exception delineated by the Pennsylvania Rules of Evidence, the Pennsylvania Supreme Court, or by statute. **Pa. R. E. 802.** Statements offered to prove a witness's course of conduct, rather than the truth of the statement do not constitute hearsay. See <u>Commonwealth v. Johnson,</u> 42 A.3d 1017, 1035 (Pa. 2012) (Sergeant's testimony that a detective believed that a boot was used in an assault to explain why Sergeant collected boot was not hearsay); <u>Commonwealth v. Rega,</u> 933 A.2d 997, 1017 (Pa. 2007) (citing <u>Commonwealth v. Sneed,</u> 526 A.2d 749, 754 (Pa. 1987)) (certain out-of-court statements offered to explain a course of police conduct are admissible).

In the present case, Detective Bauer described her training and experience in investigating theft and embezzlement cases. **N.T. Trial, November 6, 2017 (AM), at p. 9.** She discussed the investigative techniques required to uncover a substantial and intricate theft. **Id. at 9-11.** Here, Detective Bauer testified that the Defendant altered the Excel spreadsheets by inflating the credit/debit card sales, lowering the actual cash sales, and pocketing the cash. She recognized this method as a common theft scheme. **Id.** Specifically, Detective Bauer testified that the Commonwealth uncovered minor corrections to numbers and dates and she reflected those corrections in her final theft analysis. **Id. at 19.** The Defendant objected to the reference about the accountant's corrections as hearsay. **Id. at 19-20.** Detective Bauer explained she made the accountant's corrections in her theft analysis in support of her investigation. **Id. at 20.**

Therefore, this Court determined that Detective Bauer's testimony regarding the discrepancies uncovered by the accountant is non-hearsay as Detective Bauer only explained her course of conduct in modifying the Affidavit of Probable Cause. Detective Bauer's testimony was both relevant and admissible under Pa. R. E. 401 and 402. As such, the testimony was properly admitted by this Court and no abuse of discretion occurred.

39

## X. THIS COURT PROPERLY LIMITED CROSS-EXAMINATION OF DETECTIVE BAUER TO THE CONTROLLING DOCUMENT

Issue nineteen argues that the trial Court erred or abused its discretion when it precluded the Defendant from offering proof of an alibi defense through the cross-examination of Detective Bauer about the amended Affidavit of Probable Cause. Under Pa. R. Crim. P. 567, a defendant who intends to offer an alibi defense at trial shall filed a notice specifying the intent to offer an alibi defense and list the times and places the defendant is alleging to have been, as well as witnesses the defendant intends to call in support of the defense, along with their contact information. **Pa. R. Crim. P. 567.** If the Commonwealth provides the defendant notice of a change in dates at issue, the defendant's notice of alibi becomes "irrelevant" and the defendant has a duty to provide new notice for the new date. **Commonwealth v. Zimmerman, 571 A.2d 1062 (Pa. Super. 1990)**, *appeal denied* 600 A.2d 953, 529 Pa. 633, *certiorari denied*, 112 S.Ct. 1498, 503 U.S. 945, 117 L.Ed.2d 638.

Additionally, a claim challenging a court's limit of cross-examination is subject to the following standard:

> [W]e note that in cross-examining a witness, an attorney is entitled to question the witness about subjects raised during direct examination as well as any facts tending to refute inferences arising from matters raised during direct testimony... Similarly, an attorney may discredit a witness by cross-examining the witness about omissions or acts that are inconsistent with his testimony... However, the scope and limits of cross-examination is [sic] vested in the trial court's discretion and that discretion will not be reversed unless the trial court has clearly abused its discretion or made an error of law.

**Commonwealth v. Begley, 780 A.2d 605, 627 (Pa. 2001) (internal citations omitted); Commonwealth v. Kimbrough, 872 A.2d 1244, 1261–62 (Pa. Super. 2005).**

On October 5, 2017, the Defendant provided alibi dates in her Answer to the Commonwealth's Motion for Reciprocal Discovery. Subsequently, on October 16, 2017, the Commonwealth filed an amended Criminal Information specifying the total amount of cash stolen

40

based upon the same factual allegations. On October 20, 2017, the Defendant filed a Motion to Dismiss the Commonwealth's amended Criminal Information, acknowledging that she received a supplemental narrative containing the corrected amounts and dates of theft alleged as well as additional discovery. The Defendant did not provide a new notice of alibi for the changed dates.

On cross-examination, the Defendant questioned Detective Bauer regarding her preparation of the Affidavit of Probable Cause, and dates of theft. **N.T. Trial, November 6, 2017 (PM), at p. 14-16.** The Commonwealth objected, as the Defendant inaccurately referenced the original Affidavit of Probable Cause; specifically, the Defendant was questioning Detective Bauer on a date that the Defendant was not accused of stealing. **Id. at 16.** This Court sustained the Commonwealth's objection, as the document the Defendant was referring to was not the document ultimately admitted into evidence to be used in the prosecution of the case. Id. at 16-17. The Defendant cross-examined Detective Bauer on when she changed the theft dates. **Id. at 17.** Detective Bauer explained that the Affidavit of Probable Cause was not modified, but the addendum that became the Master Theft Analysis was modified to reflect the discrepancies found by the accountant. **Id.** Defense counsel continued to question on an Amended Affidavit of Probable Cause, which this Court clarified that it was the addendum, not the Affidavit itself that was modified. **Id. at 17-18.**

The Defendant's alibi dates became irrelevant when the Defendant received the supplemental narrative and the amended Criminal Information. **See Commonwealth v. Zimmerman, supra.** The Defendant did not provide new alibi dates as to the amended Criminal Information. As a result, this Court properly limited the scope of Detective Bauer's cross-examination as to the theft dates that were no longer accurate or applicable.

41

**XI.** **THE SENTENCE IMPOSED WAS WITHIN THE STATUTORY MAXIMUM AND OTHERWISE APPROPRIATE UNDER THE FACTS AND CIRCUMSTANCES OF THE CASE.**

Issues twenty and twenty-one question the propriety of this Court's sentence as manifestly excessive, failure to consider relevant sentencing criteria, consideration of factors already encompassed by the guidelines, and inadequate reasons for an aggravated sentence. Initially, this Court notes that no automatic right of appeal exists for a challenge to the discretionary aspects of sentencing. Rather, this type of appeal is more appropriately considered a petition for allowance of appeal. Commonwealth v. Rossetti, 863 A.2d 1185, 1193-1194 (Pa. Super. 2004) (citing Commonwealth v. Ritchey, 779 A.2d 1183, 1185 (Pa. Super.2001) (citations omitted)).

Before reaching the merits of a discretionary sentencing issue, a court must ascertain whether an appellant (i) filed a timely notice of appeal, (ii) properly preserved the issue to be heard on appeal, (iii) filed a brief free of fatal defects, and (iv) raised a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. Commonwealth v. Mastromarino, 2 A.3d 581, 588 (Pa. Super. 2010), cert. denied, 609 Pa. 685.

An appellate court evaluates whether a particular issue raises a substantial question on a case-by-case basis. Commonwealth v. Rossetti, 863 A.2d 1185, 1194 (Pa. Super. 2004). "[The court] will grant an appeal only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code or (2) contrary to the fundamental norms which underlie the sentencing process." Commonwealth v. Brown, 741 A.2d 726, 735 (Pa. Super. 1999) (en banc). The Pennsylvania Supreme Court has held that a claim regarding a sentence being excessive which is within the statutory limits can raise a substantial

42

question, if the appellant "sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process." Commonwealth v. Mouzon, 812 A.2d 617, 627-28 (Pa. 2002). However, the Pennsylvania Superior Court does not accept bald allegations of excessiveness. Commonwealth v. Reynolds, 835 A.2d 720, 733 (Pa. Super. 2003).

No substantial question exists as to the Defendant's sentence, since the sentence imposed was within the statutory limits and the sentences conformed to sentencing norms. This Court thoroughly reviewed a PSI report, all mitigating and aggravating factors, and particularly crafted the Defendant's sentence based upon the facts and circumstances presented at trial and throughout the sentencing phase.

The Defendant challenges the discretionary aspects of sentencing, however, it is well-established that the sentencing function is a matter vested within the sound discretion of the sentencing court and will not be disturbed on appeal absent a manifest abuse of discretion. See Commonwealth v. Walls, 926 A.2d 957, 961 (Pa. 2007). "[A]n abuse of discretion is more than a mere error of judgment. ... [A] sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." Id. (quotations omitted). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." Id., quoting Grady v. Frito-Lay, Inc., 839 A.2d 1038, 1046

43

(2003). The rationale offered by the Pennsylvania Supreme Court for this deferential standard is as follows:

> Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court. Thus, rather than cabin the exercise of a sentencing court's discretion, the guidelines merely inform the sentencing decision.

**Walls, 926 A.2d at 961-62 (citations omitted).**

A sentence of confinement must be "consistent with the protection of the public, the gravity of the offense as it related to the impact on the life of the victims and on the community, and the rehabilitative needs of the defendant." **42 Pa. C.S.A § 9721(b).** A sentencing court may determine a defendant's potential for rehabilitation by considering demeanor, apparent remorse, manifestation of social conscience, and cooperation with law enforcement agents. **Commonwealth v. Begley, 780 A.2d 605, 644 (Pa. 2001); Commonwealth v. Constantine, 478 A.2d 39 (Pa. Super. 1984); Commonwealth v. Gallagher, 442 A.2d 820 (Pa. Super. 1982).** Moreover, facts regarding the nature and circumstances of the offense that are not necessarily elements of the convicted offense, are proper factors to consider in deciding to sentence in the mitigated range or the aggravated range. **Commonwealth v. Chilquist, 548 A.2d 272 (Pa. Super. 1988). See also, Commonwealth v. Darden, 531 A.2d 1144, 1149 (Pa. Super. 1987)** Additionally, trial courts are permitted to use prior conviction history and other facts already included in the guidelines, if they supplement other extraneous sentencing information. **Commonwealth v. Simpson, 829 A.2d 334, 339 (Pa. Super. 2003).** Furthermore, the decision to impose a

44

concurrent or consecutive sentence rests within the discretion of the sentencing court. **Commonwealth v. Johnson, 961 A.2d 877, 880 (Pa. Super. 2008) (citing Commonwealth v. Lloyd, 878 A.2d 867, 873 (Pa. Super. 2005)). See also, Commonwealth v. Hoag, 665 A.2d 1212 (Pa. Super. 1995)**(stating an appellant is not entitled to a "volume discount" for their crimes by having all sentences run concurrently).

Additionally, if a pre-sentence investigative report (hereinafter "PSI") exists, appellate courts presume that the sentencing court "was aware of relevant information concerning the defendant's character and weighed those considerations along with mitigating statutory factors. A PSI constitutes the record and speaks for itself." **Commonwealth v. Devers, 546 A.2d 12, 18 (Pa. 1988).** The **Devers** court further articulated that "it would be foolish, indeed, to take the position that if a court is in possession of the facts, it will fail to apply them to the case at hand." **Id. See Commonwealth v. Boyer, 856 A.2d 149 (Pa. Super. 2004); Commonwealth v. Burns, 765 A.2d 1144 (Pa. Super. 2000).**

Accordingly, this Court had the benefit of a PSI, which provided specific facts about the Defendant's character and lengthy theft-related history, including her Prior Record Score of 4, as well as the fact that the Defendant committed the instant theft offenses while on supervision. This Court presided over the Defendant's four-day jury trial, and observed the Defendant's demeanor as well as listened to her testimony and considered the Commonwealth's evidence. This Court also reflected on the victims and the significant financial impact the Defendant's actions caused in their personal lives and their business. **N.T. Sentencing, January 30, 2018, at p. 5-16.** The Defendant addressed this Court and echoed her previous sentiments promising future growth. However, this Court noted that the Defendant's past words of remorse rang hollow given her

45

pattern of thefts and current criminal behavior. **Id. at 18-19.** Therefore, this Court found no mitigating factors present. Rather, this Court found the following aggravating factors including the well-planned, long-term, systematic theft from the Goodfield family and Cousin's Convenient Marts. **Id. at 19.** This Court noted that the planning, intent, substantial amount of theft, and length of time as well as frequency of the theft occurrences justified an aggravated range sentence. **Id.**

Under these circumstances and the applicability of the Sentencing Guidelines, this Court sentenced the Defendant as follows:

> 16 CR 464, CT 1: thirty-six (36) – seventy-two (72) months, with three (3) years probation
> 16 CR 464, CT3: seventeen (17) – thirty-six (36) months, with two (2) years probation

This Court also imposed sentence for the Defendant's probation violations, revoking and re-sentencing as follows:

> 01 CR 70, CT 3: six (6) - twelve (12) months, with three (3) years probation
> 01 CR 1750, CT 2: six (6) - twelve (12) months, with three (3) years probation
> 01 CR 1751, CT 2: six (6) - twelve (12) months, with three (3) years probation
> 03 CR 1094, CT 1: six (6) - twelve (12) months, with three (3) years probation

All of the Defendant's sentences were ordered consecutively, and aggregated to seventy-seven (77) to one hundred and fifty-six (156) months of incarceration followed by seventeen (17) years of probation, supervised by the Pennsylvania Board of Probation and Parole.

The sentence was appropriate under the facts and circumstances of this case and in light of the guidelines. This Court considered the punitive, deterrent, and rehabilitative purposes of sentencing, as well as the impact of the crimes on the victims, their families, and upon the community. The sentence imposed was within the statutory maximum. Moreover, this Court had the benefit of a PSI report, and weighed the information accordingly.

46

Therefore, based upon the foregoing reasons, the sentence imposed by this Court was neither excessive nor harsh, and no abuse of discretion occurred. Moreover, the record supports and justifies the sentence imposed.

## CONCLUSION

Accordingly, the testimony and evidence at trial was sufficient to sustain the jury's verdict. A review of the record indicates that evidentiary rulings made by the trial Court were lawful and appropriate. Finally, the sentence imposed was within the statutory maximum citing aggravated factors that supported this Court's rationale for state incarceration. Therefore, the Defendant's conviction should be upheld and this Court's Judgment of Sentence should be affirmed.

BY THE COURT:

_____, P.J.
Michael J. Barrasse

CC: Notice of the entry of the foregoing Memorandum has been provided to each party pursuant to Pennsylvania Rule of Criminal Procedure 114 by mailing time-stamped copies to the following individuals:

Lackawanna County District Attorney's Office
Robert M. Buttner, Esq.

47